STATE OF CONNECTICUT *v.* ERIC AMADO
(15176)

Lavery, Heiman and Hennessy, Js.

Argued February 16—officially released July 30, 1996

---

*Lauren Weisfeld,* assistant public defender, for the appellant (defendant).

*Susann E. Gill,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Jonathan C. Benedict,* assistant state's attorney, for the appellee (state).

HEIMAN, J. The defendant appeals[1] from the judgment of conviction, rendered after a jury trial, of two counts of murder in violation of General Statutes § 53a-54a,[2] two counts of felony murder in violation of General Statutes § 53a-54c,[3] and capital felony in violation of

---

[1] The defendant originally appealed to the Supreme Court pursuant to General Statutes § 51-199 (b) (3). The Supreme Court transferred the appeal to this court pursuant to General Statutes § 51-199 (c).

[2] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[3] General Statutes § 53a-54c provides in pertinent part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

The defendant was charged under the attempted robbery provision of § 53a-54c.

General Statutes § 53a-54b.[4] The trial court sentenced the defendant on the capital felony conviction only and imposed a sentence of life imprisonment without the possibility of release pursuant to General Statutes 53a-35a.[5] The defendant claims that the judgment should be reversed because of deficiencies in the trial court's charge on the law of self-defense. Specifically, the defendant asserts that the trial court improperly instructed the jury (1) on the victims' right to defend their premises where that right was not at issue, (2) on the use of reasonable force, (3) on the concept of initial aggressor, (4) on the duty to retreat and (5) that self-defense is not a defense to a charge of felony murder.

Although the defendant raises a number of issues relating to the trial court's charge on self-defense, the dispositive issue in this appeal is whether self-defense, codified in General Statutes § 53a-19,[6] is available as a

---

[4] General Statutes § 53a-54b provides in pertinent part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

[5] General Statutes § 53a-35a provides in pertinent part: "For any felony committed on or after July 1, 1981, the sentence of imprisonment shall be a definite sentence and the term shall be fixed by the court as follows: (1) For a capital felony, a term of life imprisonment without the possibility of release unless a sentence of death is imposed . . . ."

[6] General Statutes § 53a-19 provides: "(a) Except as provided in subsections (b) and (c) of this section, a person is justified in using reasonable physical force upon another person to defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force, and he may use such degree of force which he reasonably believes to be necessary for such purpose; except that deadly physical force may not be used unless the actor reasonably believes that such other person is (1) using or about to use deadly physical force, or (2) inflicting or about to inflict great bodily harm.

"(b) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using deadly physical force upon another person if he knows that he can avoid the necessity of using such force with complete safety (1) by retreating, except that the actor shall not be required to retreat if he is in his dwelling, as defined in section 53a-100, or place of work and was not the initial aggressor, or if he is a peace officer or a private person assisting such peace officer at his direction, and acting pursuant to section

defense to a charge of felony murder. If self-defense is not available as a defense to felony murder, then the defendant's attack on the self-defense charge as it applies to his felony murder convictions would be unavailing, and, consequently, the felony murder convictions would support the capital felony conviction.[7] If the capital felony conviction is supported by the felony murder convictions, we need not address the defendant's attack on the self-defense charge as it applies to his intentional murder convictions because, regardless of any impropriety in the self-defense charge as it applies to the intentional murder convictions, the capital felony conviction would remain intact.[8] Thus, the resolution of the defendant's fifth claim is dispositive of this appeal.

The jury could reasonably have found the following facts. On October 18, 1990, and for some time prior thereto, Eric Amado was living in an apartment in West Haven with Joanne Bailey and Hope Vaughn. Amado also stored cocaine that he was selling in bulk in the apartment. He stored the narcotics in a small safe and in a duffel bag, both of which were kept in the laundry room of the apartment.

On October 18, 1990, Vaughn called Anthony Young at his residence at 505 Williams Street in Bridgeport.

53a-22, or (2) by surrendering possession of property to a person asserting a claim of right thereto, or (3) by complying with a demand that he abstain from performing an act which he is not obliged to perform.

"(c) Notwithstanding the provisions of subsection (a) of this section, a person is not justified in using physical force when (1) with intent to cause physical injury or death to another person, he provokes the use of physical force by such other person, or (2) he is the initial aggressor, except that his use of physical force upon another person under such circumstances is justifiable if he withdraws from the encounter and effectively communicates to such other person his intent to do so, but such other person notwithstanding continues or threatens the use of physical force, or (3) the physical force involved was the product of a combat by agreement not specifically authorized by law."

[7] See footnote 4.

[8] As we have indicated, it is only for the capital felony conviction that the defendant has been sentenced.

Young came to the West Haven apartment, and he and Vaughn removed the duffel bag and the safe from the apartment and placed them in the trunk of Young's red Toyota Celica. Before leaving the apartment, Vaughn and Young opened the window and knocked some items to the floor to make it appear that someone had broken into the premises. They left West Haven and went to 505 Williams Street. When they arrived in Bridgeport, Young telephoned Peter Hall, who then went to 505 Williams Street.

Some time during that same day, Amado returned to the apartment and found that a window had been opened and that items in the apartment had been knocked over. Amado had gone to the apartment to pick up a quantity of cocaine that he was going to deliver to a purchaser. When Amado went to the laundry room where his drugs had been stored, he discovered that the drugs were missing. Bailey also returned to the apartment and discovered the open window and the items knocked to the floor. She left the premises and went to her sister's house in Bridgeport.

Later in the day, Amado picked up Bailey at her sister's house in Bridgeport. Amado was driving a white Mitsubishi. Amado was accompanied by Anthony Smalls. The group went to Norwalk to look for Vaughn to ascertain whether she knew who was responsible for the theft of the drugs. Amado, Bailey and Smalls met John Wideman, who joined in the search for Vaughn.

The group went to Stamford. They arrived at a house, and Bailey and Wideman waited in the car while Amado and Smalls entered the house. After about thirty minutes, Smalls emerged from the house. Fifteen minutes later, Amado came out of the house. Amado told the others that he had been visiting with a "voodoo man" who had told him that Vaughn and two others had stolen his drugs.

The group returned to Bridgeport and left Bailey at her sister's house. Amado told her to stay there until he returned. Amado, Smalls and Wideman left the house and returned about ten minutes later accompanied by David Bailey, who was driving a blue Volvo.

The group of five decided to look for Vaughn. Amado, Smalls and Joanne Bailey rode in the white Mitsubishi, while Wideman and David Bailey rode in the blue Volvo. They first went to Vaughn's sister's house and when they did not find Vaughn there, they proceeded to 505 Williams Street. The four men were armed with pistols. They arrived at 505 Williams Street at about 9 p.m. and observed Vaughn standing on the porch with Young and Hall. Amado told Joanne Bailey to go to the porch and tell Vaughn that he wanted to talk with her. Vaughn came down from the porch and entered the white Mitsubishi. Amado asked Vaughn if she knew where his drugs were. Vaughn denied any knowledge of the theft or whereabouts of the missing cocaine. While questioning Vaughn, Amado was upset and talked loudly. Amado, Smalls, Vaughn, Wideman, David Bailey and Joanne Bailey left Williams Street and arrived at the West Haven apartment at about 2:30 a.m. on October 19, 1990. The group remained there overnight.

At about 10 a.m., Amado and Joanne Bailey went into the hallway to talk with neighbors. Amado wanted to determine whether the neighbors had observed anyone removing items from his apartment. After speaking with a neighbor across the hall, Amado told Vaughn that he had learned that she had taken his cocaine. Amado told Vaughn that the neighbor had seen her in a red Toyota Celica. Vaughn said that the vehicle belonged to Young.

Amado, Smalls, Vaughn, Wideman, David Bailey and Joanne Bailey proceeded to 505 Williams Street. Amado, Smalls, Vaughn and Joanne Bailey rode in the white Mitsubishi and the others rode in the blue Volvo. They

arrived at the house at about 11 a.m., and everyone exited the vehicles. Amado and Smalls were both armed with handguns.

Amado, Vaughn and Joanne Bailey went to the porch of the house and rang the doorbell. When nobody answered, they knocked on the door. Young opened the door and Hall was standing behind him. Hall had a gun in the waistband of his pants. Amado accused Young and Hall of having his cocaine, and both Young and Hall denied having the drugs.

Young asked if they could talk, and Amado began shooting. He fired five shots. Joanne Bailey was shot in the left thigh, Young was shot in the left groin area and Hall was shot on the left side of the abdomen. Joanne Bailey went into the house, fell down and crawled into the kitchen. Hall went into the kitchen and collapsed on the floor near the refrigerator. Young collapsed in the front hall near the doorway.

Amado, Smalls, Wideman and David Bailey fled. Vaughn called 911 from a neighbor's house and EMTs responded to the call. When the EMTs arrived at the house, the front door was locked and they were unable to enter. Vaughn returned and was screaming, "He's shot." She kicked in the window, entered the house and opened the front door for the EMTs.

Upon entering the house, the EMTs observed Young lying on the floor of the front hallway. He was unconscious and had sustained a gunshot wound. He was clutching a fully loaded magazine for an automatic weapon. Hall, also suffering from a gunshot wound, was sitting on the floor in the bedroom. He was unconscious, but his eyes were open. He held a small automatic pistol. The hammer of the pistol was cocked back, and his finger was on the trigger. The EMTs also found Joanne Bailey.

The Bridgeport police arrived. Officer John Galpin spoke with Young, who had regained consciousness, and asked him to name the person who had shot him. Young responded that Amado had shot him. Young and Hall were transported to Bridgeport Hospital. Young died as a result of a gunshot wound to the groin area and Hall died as a result of a gunshot wound to the abdomen.

The police obtained a search warrant for 505 Williams Street, and a search of the basement resulted in the seizure of two large plastic bags containing rocky white powder. One of the plastic bags was inside a black duffel bag. In addition, the police found a strainer, a spoon and a safe. The contents of the plastic bags tested positive for crack cocaine. The total weight of the two bags was about three and one-half pounds and the drugs had a bulk value of about $38,000.

An arrest warrant was issued for Amado (hereinafter the defendant), and he was arrested in Georgia as a fugitive from justice. Bridgeport authorities were notified of the defendant's arrest on March 21, 1992, and approximately ten months later he was returned to Bridgeport for trial.

The defendant testified at trial. He conceded that he had shot the victims, but asserted that he did so in self-defense. He admitted that he lived in the West Haven apartment with Joanne Bailey and that in October, 1990, he had been engaged in selling cocaine. He also conceded that the duffel bag containing the cocaine and the safe were his property. He claimed that on October 18, 1990, he discovered that these items were missing and that he and the others went to Bridgeport to find out about the disappearance of the items.

The defendant testified that upon arriving at 505 Williams Street, he walked up to the front door. He asserted

that he did not display a weapon as he went to the door. He claimed that the first person that he observed in the doorway was Young. The defendant testified that he told Young that the house in West Haven had been "robbed" and that Young's car had been observed there. The defendant claimed that he asked Young whether he knew anything about the incident. According to the defendant, Young indicated that "he hadn't been up there" and that "he didn't have anything to do with it."

The defendant further testified that as this conversation was taking place, Hall appeared in the doorway and stood to the rear of Young. The defendant stated that both Young and Hall were standing inside the house, while the defendant was standing on the porch. The defendant said that Smalls, who was standing to his rear, yelled at the men in the doorway, "Do you have our shit or don't you?" The defendant asserted that Young became upset and shouted back at Smalls. The defendant testified that, up to this point, neither Young nor Hall appeared to have a weapon.

According to the defendant, Young then took a step forward and the defendant took a step back. The defendant claimed that he then saw Hall reach for the waistband of his trousers and start to draw a gun. The defendant testified that he became frightened because he thought Hall was going to shoot him. The defendant claimed that he drew his gun and shot into the house several times because he saw Hall pull out a gun. The defendant asserted that following the shooting, he ran away. He testified that during the incident, he did not know that he had shot Young and Hall.

We now turn to the fifth claim advanced by the defendant, namely, that the trial court improperly instructed the jury that self-defense is not available as

a defense to a charge of felony murder.[9] As we have stated, if this claim is without merit, then, regardless of whether the self-defense instructions were improper as to the intentional murder convictions, the defendant's felony murder convictions would properly support his capital felony conviction, and, consequently, the judgment must be affirmed. We recognize that this precise issue has not been directly addressed by our appellate courts.[10] We are persuaded, however, that the trial court acted properly in instructing that self-defense is not available as a defense to a charge of felony murder.

We begin our analysis by recognizing that the defendant has a constitutionally guaranteed due process right

[9] The trial court, in three instances, instructed the jury that self-defense is not available as a defense to a charge of felony murder:

(1) "[S]elf-defense applies to [the] offense of murder here. *Now, I'm going to go into a murder felony. Self-defense does not apply to that.*" (Emphasis added.) (2) "Now, if you believe the defendant was certainly acting in the course of self-defense and the state has not . . . met its burden of disproving the effectiveness of that defense then you'd find him not guilty of murder. Not guilty in both instances. *But then you still consider the offenses of felony murder.*" (Emphasis added.) (3) "First, let me make it clear to you that in regard to the offenses of murder and any lesser included offense of manslaughter in subsection one or three, intentional or reckless manslaughter, those three in relation to both deaths in relation to this defendant, the defense of self-defense applies to murder and any lesser included offense of manslaughter. It does apply to that. *It does not apply to felony murder.* If you make all your decisions about murder and manslaughter, should you reach that subject, you move on to the subject of, or having left it earlier, whichever way you like to do it, *on the felony murder self-defense does not apply to whether or not the accused is guilty of felony murder.*" (Emphasis added.)

[10] In both *State* v. *Quintana*, 209 Conn. 34, 44–51, 547 A.2d 534 (1988), and *State* v. *Miller*, 36 Conn. App. 506, 651 A.2d 1318, cert. denied, 232 Conn. 912, 654 A.2d 357 (1995), the defendants attacked their felony murder convictions on the ground that the trial court improperly instructed the jury on the law of self-defense. In each case, the court held that the instructions concerning self-defense did not warrant a reversal. In neither case, unlike in the present case, does it appear that the trial court instructed the jury that self-defense is not available as a defense to a charge of felony murder. Thus, the precise issue that we must address here was neither raised nor discussed in *Quintana* or *Miller*, and, therefore, the opinions in those cases are not dispositive of this appeal.

to establish a defense. *Washington* v. *Texas*, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *Scarpiello*, 40 Conn. App. 189, 204, 670 A.2d 856 (1996). The right to establish a defense, however, is not limitless. The defense sought to be established must be legally cognizable as a valid defense to the crime charged. See *State* v. *Anthony*, 24 Conn. App. 195, 208–209, 588 A.2d 214, cert. dismissed, 218 Conn. 911, 591 A.2d 813, cert. denied, 502 U.S. 913, 112 S. Ct. 312, 116 L. Ed. 2d 254 (1991). Thus, we must examine the nature of the crime charged in order to determine the applicability of a defense to that particular crime.

Our felony murder statute, § 53a-54c, "contains no mens rea requirement beyond that of an intention to commit the underlying felony upon which the felony murder charge is predicated." *State* v. *Valeriano*, 191 Conn. 659, 662, 468 A.2d 936, (1993), cert. denied, 466 U.S. 974, 104 S. Ct. 2351, 80 L. Ed. 2d 824 (1983). "In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, *that a death was caused in the course of and in furtherance of that felony. . . .* There is no requirement that the state prove an intent to cause death." (Citation omitted; emphasis added.) *State* v. *Castro*, 196 Conn. 421, 428–29, 493 A.2d 223 (1985). "Indeed, [t]he felony murder statute does not require that the defendant commit the homicidal act. . . . A defendant may be liable if a death is caused by *any* participant in the underlying felony." (Citations omitted; internal quotation marks omitted.) *State* v. *Kyles*, 221 Conn. 643, 668, 607 A.2d 355 (1992).

Thus, the elements of felony murder differ markedly from those of intentional murder. Our Supreme Court has recognized this difference in determining that manslaughter is not a lesser included offense of felony murder. In *State* v. *Castro*, supra, 196 Conn. 428–429, the

court held: "In both lesser degrees of manslaughter the state must prove that the defendant possessed a culpable state of mind. Manslaughter in the first degree requires a showing that the defendant had the 'intent to cause serious physical injury.' General Statutes § 53a-55. Manslaughter in the second degree requires proof that a killing was committed 'recklessly.' General Statutes § 53a-56. In contrast, the felony murder statute contains no such mens rea element. . . . Since both first and second degree manslaughter require the showing of a culpable state of mind, manslaughter is not a lesser included offense of felony murder." (Citations omitted.)

The purpose of the felony murder statute is to "punish those whose conduct brought about an unintended death in the commission or attempted commission of a felony. . . . The felony murder rule includes accidental, unintended deaths. Indeed, [our Supreme Court has] noted that crimes against the person like robbery, rape and common-law arson and burglary are, in common experience, *likely to involve danger to life in the event of resistance by the victim*. . . . Robberies by armed robbers no doubt are even more likely to result in unintended deaths than are arsons. Often it is the victim of the robbery who is accidently killed. The armed robber committing or attempting a robbery whose loaded gun . . . is *discharged accidentally when the robber and* [another person] are struggling for the gun, is guilty of felony murder when the [person] is thus killed. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Kyles,* supra, 221 Conn. 667. Moreover, "[t]he legislative history of § 53a-54c indicates that the felony murder statute was enacted to provide prosecutors with a means of proving murder in cases where a homicide occurs during the commission of certain felonies but specific intent to kill cannot be proven. 17 H.R. Proc., Pt. 6, 1974 Sess., pp. 3218–19, 3221–22; Conn. Joint

Standing Committee Hearings, Judiciary, 1974 Sess., pp. 236–37." *State* v. *Greco*, 216 Conn. 282, 297, 579 A.2d 84 (1990).

Courts often decline to allow a defendant to raise a claim of self-defense in a felony murder case. See 2 P. Robinson, Criminal Law Defenses (1984) § 132, p. 99 . Having examined the language and purpose of § 53a-54c, we conclude that the trial court was correct in instructing that self-defense is not available as a defense to a charge of felony murder. In support of our conclusion, we next examine the opinions of courts of other jurisdictions that we find to be persuasive.

"[I]t has been held that the right to claim self-defense may be forfeited by one who commits an armed robbery, even if excessive force is used by the intended victim or by any person intervening to prevent the crime or apprehend the robber. *Wilson* v. *State*, 473 P.2d 633, 636 (Alaska 1970). See *People* v. *Dillard*, 5 Ill. App. 3d 896 [284 N.E.2d 490] (1972) (robber has no right to kill his victim to save his own life)." *Commonwealth* v. *Maguire*, 375 Mass. 768, 773, 378 N.E.2d 445 (1978). The United States Court of Appeals for the Second Circuit has determined that in a prosecution for felony murder under federal law, "[o]ne who commits or attempts a robbery armed with deadly force, and kills the intended victim when the victim responds with force to the robbery attempt, may not avail himself of the defense of self-defense." *United States* v. *Thomas*, 34 F.3d 44, 48 (2d Cir. 1994). The court reasoned that " '[i]t has long been accepted that one cannot support a claim of self-defense by a self-generated necessity to kill. The right of homicidal self-defense is . . . denied to slayers who incite the fatal attack. . . . In sum, one who is the aggressor in a conflict culminating in death cannot invoke the necessities of self-preservation.' " Id., quoting *United States* v. *Peterson*, 483 F.2d 1222, 1231 (D.C. Cir.), cert. denied, 414 U.S. 1007, 94 S. Ct. 367, 38 L.

Ed. 2d 244 (1973). "Under this principle," the court held, "the defendants had no entitlement to any self-defense charge." *United States* v. *Thomas,* supra, 48.

The California Court of Appeals, which has also recently discussed the inapplicability of self-defense to a charge of felony murder, held: "The purpose of the felony-murder rule is to deter even accidental killings in the commission of designated felonies by holding the felon strictly liable for murder. (*People* v. *Washington* (1965) 62 Cal. 2d 777, 781 [44 Cal. Rptr. 442, 402 P.2d 130].) When a burglar kills in the commission of a burglary, he cannot claim self-defense, for this would be fundamentally inconsistent with the very purpose of the felony-murder rule. (*People* v. *Arauz,* (1970) 5 Cal.App.3d 523, 533 [85 Cal. Rptr. 266]; *People* v. *Dillon,* [34 Cal. 3d 441, 484 n.29, 194 Cal. Rptr. 390, 668 P.2d 697])." *People* v. *Loustaunau,* 181 Cal. App. 3d 163, 170, 226 Cal. Rptr. 216 (1986).

The Supreme Court of Alaska has similarly explained that "[a]uthority clearly . . . indicates that a person who provokes a difficulty thereby forfeits his right to self-defense. This doctrine has been extended to preclude a person who commits a felony from claiming self-defense not only to the intended victim of the felony, but also as to any person intervening in an attempt either to prevent the crime or to apprehend the criminal." *Gray* v. *State,* 463 P.2d 897, 908–909 (Alaska 1970). Thus, the Alaska court held: "Where . . . the defendant commits a felony which includes an immediate threat of violence, he has created a situation so fraught with peril as to preclude his claim of self-defense to any act of violence arising therefrom." Id., 910. Moreover, the Alaska court summarized its reasoning by stating that, in the felony murder situation at issue, "[t]o permit appellants to justify their slaying of [the victim] by claiming self-defense . . . would be to fashion a rule of law unresponsive to society's need for protection

against just such extraordinarily dangerous conduct. This would not, in our view, tend to facilitate decent and peaceful behaviour by all. To bestow such a privilege to slay would be manifestly unsound." (Internal quotation marks omitted.) Id.

Finally, as the United States District Court for the District of Maryland has recognized, "[w]hen a defendant is charged under [the Maryland felony murder statute], the defense of self-defense is unavailable to him as a matter of law because he is an aggressor engaged in the perpetration of a felony. *Street* v. *State*, 26 Md. App. 336, 340, 338 A.2d 72 (1975). This . . . construction of the felony-murder statute comports with the general rule on the subject of the non-availability of self-defense as a defense to felony-murder. See *Smith* v. *State*, 209 Tenn. 499, 503, 354 S.W.2d 450, 452 (1961); *People* v. *Perry*, 14 Cal. 2d 387, 94 P.2d 559 (1939); 1 Wharton's Criminal Law and Procedure § 252 (1957)." *Street* v. *Warden*, 423 F. Sup. 611, 613–14, (D. Md. 1976), aff'd, 549 F.2d 799 (4th Cir. 1976), cert. denied, 431 U.S. 906, 97 S. Ct. 1700, 52 L. Ed. 2d 390 (1977).

We conclude that a bright line rule that self-defense is not available as a defense to a charge of felony murder in violation of § 53a-54c is warranted. It is incongruous with the purpose of the felony murder statute to allow a defendant who causes a death in the course of committing an enumerated felony to mount a defense afterward asserting that he was merely defending himself against an attempt to thwart his felonious purpose.[11] A defendant's invocation of self-defense under such circumstances gives new meaning to the word "chutzpah."[12]

---

[11] Our conclusion that self-defense is not available as a defense to a charge of felony murder applies equally to a situation where a "participant" under § 53a-54c causes the death of the victim.

[12] Merriam-Webster's Collegiate Dictionary (10th Ed. 1993) defines chutzpah as "supreme self-confidence," "nerve, gall." See also A. Kozinski & E. Volokh, "Lawsuit, Shmawsuit," 103 Yale L.J. 463, 463–64 (1993).

We decline to import such an untenable rule into Connecticut jurisprudence.

On the basis of the foregoing, we conclude that the trial court properly instructed the jury that self-defense is not available as a defense to a charge of felony murder. Because the defendant's two felony murder convictions, unsuccessfully attacked, properly support the defendant's conviction of capital felony, we need not, and do not, discuss the defendant's attack on the trial court's jury charge as it relates to the defendant's two intentional murder convictions.

The judgment is affirmed.

In this opinion the other judges concurred.