STATE OF CONNECTICUT *v.* JAMEL BURKE
(AC 17733)

Landau, Spear and Hennessy, Js.

Argued September 28, 1998—officially released February 16, 1999

*Theresa M. Dalton*, assistant public defender, for the appellant (defendant).

*Ellen Jawitz*, assistant state's attorney, with whom, on the brief, was *Maureen Keegan*, acting state's attorney, for the appellee (state).

*Opinion*

HENNESSY, J. The defendant, Jamel Burke, appeals from the judgment of conviction, rendered after a jury trial, of felony murder in violation of General Statutes § 53a-54c[1] and burglary in the third degree in violation of General Statutes § 53a-103 (a).[2] The defendant claims (1) that the trial court improperly instructed the jury on self-defense or, in the alternative, that the evidence was insufficient to disprove the defendant's claim of self-defense, (2) that the evidence of causation was insufficient to sustain a finding of probable cause on

---

[1] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit . . . burglary . . . and, in the course of and in furtherance of such crime or flight therefrom, he . . . causes the death of a person other than one of the participants . . . ."

[2] General Statutes § 53a-103 (a) provides: "A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein."

the felony murder charge and (3) that the trial court improperly denied the defendant's motion for judgment of acquittal because the evidence was insufficient to prove beyond a reasonable doubt that he caused the victim's death and that the death occurred in flight from the burglary. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On May 27, 1995, the victim, John J. Walsh, Jr., was working at the Fox Cafe as a doorman. A Fox Cafe employee found the victim on the ground in the Fox Cafe parking lot with blood flowing from his right temple. The victim was taken to the Waterbury Hospital emergency room where he was subsequently removed from life support.

On the basis of a tip, the police questioned David Monell regarding the homicide. After questioning Monell, the police obtained a search and seizure warrant for the defendant's person and residence. The police brought the defendant to the police station, where he gave the police a written, signed statement. The defendant indicated that on May 27, 1995, while at a party, he and Monell talked about breaking into a car to obtain a car stereo. They drove to the Fox Cafe where they noticed a Dodge Caravan with a car stereo and an alarm. They pulled into the parking lot next to the Fox Cafe, and the defendant approached the Caravan with a flashlight and a screwdriver while Monell waited in his car. Using the screwdriver, the defendant popped the front passenger window, setting off the car alarm, and reached in to open the Caravan door.

The defendant quickly removed the car stereo from the Caravan using the screwdriver and started to walk back to Monell's car when he heard the victim running after him. The defendant threw the stereo at the victim to stop him. The victim kept running, however, and tackled the defendant. A struggle ensued, during which

the defendant swung both fists at the victim until he stopped struggling. When the defendant returned to Monell's car, he noticed that he still had the screwdriver in his hand and "figured that [he] stuck the . . . guy with the screwdriver." The defendant left the scene in Monell's car and returned to the party. The defendant told Monell that he thought that he "might have stabbed the guy." Other facts will be discussed where relevant to the issues on appeal.

## I

## A

The defendant first claims that the trial court improperly instructed the jury on self-defense. Specifically, the defendant argues that the trial court misled the jury by directing it to find that the defendant's use of force constituted deadly physical force and by injecting the right of the victim to make a civilian arrest into the self-defense instruction.

The defendant failed to raise these claims at trial and now seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or under the plain error doctrine.[3]

"In *Golding*, [our Supreme Court] held: [A] defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged

---

[3] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

"[W]e will review an unpreserved claim under the plain error doctrine only in those truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of a public confidence in the judicial proceedings." (Internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 687, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Cole*, 50 Conn. App. 312, 318, 718 A.2d 457, cert. granted on other grounds, 247 Conn. 937, 722 A.2d 1217 (1998).

The record is adequate to review the alleged claim of error. In addition, we recognize that "the defendant has a constitutionally guaranteed due process right to establish a defense. . . . The right to establish a defense, however, is not limitless. The defense sought to be established must be legally cognizable as a valid defense to the crime charged." (Citations omitted.) *State* v. *Amado*, 42 Conn. App. 348, 357–58, 680 A.2d 974 (1996), remanded for reconsideration, 242 Conn. 906, 697 A.2d 368 (1997), on reconsideration, 50 Conn. App. 607, 719 A.2d 45 (1998), cert. granted, 247 Conn. 953, 723 A.2d 811 (1999).[4] The defendant's claim is not of constitutional magnitude because self-defense is not legally cognizable as a valid defense to a felony murder charge; id., 362; and, therefore, does not warrant review under *Golding*.[5]

---

[4] We are aware that the Supreme Court has granted certification in *State* v. *Amado*, supra, 247 Conn. 953. The defendant's petition for certification in *Amado* was granted, limited to the issue of whether this court properly concluded that "the defense of self-defense does not apply to a charge of felony murder as a matter of law." (Internal quotation marks omitted.) Id.

[5] In addition, we decline to review the defendant's claim under the plain error doctrine because self-defense is not a valid defense to a felony murder charge; *State* v. *Amado*, supra, 42 Conn. App. 362; and, therefore, any error would not affect the fairness and integrity of and public confidence in the judicial proceedings.

The defendant urges this court to reconsider the bright line rule established in *State* v. *Amado*, supra, 42 Conn. App. 362, that self-defense is not available as a defense to a charge of felony murder in violation § 53a-54c. The defendant argues that the facts in this case do not comport with the rationale behind felony murder because he broke into an unoccupied motor vehicle and, therefore, was less likely to involve danger to life in the event of resistance by the victim. The defendant's argument does not persuade us to revisit the rule articulated in *Amado*.

B

The defendant next claims that the evidence was insufficient to disprove his claim of self-defense beyond a reasonable doubt. This claim fails because self-defense is not available as a defense to a charge of felony murder in violation of § 53a-54c. *State* v. *Amado*, supra, 42 Conn. App. 362. Because the defendant's claim of self-defense was not properly before the trier of fact, the state did not need to disprove that claim beyond a reasonable doubt.

II

The defendant next claims that the evidence was insufficient to sustain a finding of probable cause on the felony murder charge because the state failed to prove that he caused the death of the victim as required under the felony murder statute.

The defendant failed to raise this claim at trial and now seeks review under *Golding* and the plain error doctrine. The defendant's claim is reviewable under *Golding* because the record is adequate for review and the claim is of constitutional magnitude because " '[A]rticle first, § 8, of the Connecticut constitution, as amended, provides in part that "[n]o person shall be held to answer for any crime, punishable by death or

life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law." ' *State* v. *Boyd*, 214 Conn. 132, 135, 570 A.2d 1125 (1990)." *State* v. *Marra*, 222 Conn. 506, 513, 610 A.2d 1113 (1992).

The defendant argues that, absent a statutory definition of "death" in the penal code, the common law definition applies. Specifically, the defendant argues that "[t]he common law defined death as 'the cessation of life,' and set a medical standard of the stoppage of the circulatory and respiratory systems." The defendant further argues that the victim's circulatory and cardiovascular functions had not ceased at the time he was taken to the hospital, and that his removal from life support relieves the defendant of criminal responsibility for the victim's death by removing the causation element.

While this appeal was pending, our Supreme Court decided *State* v. *Guess*, 244 Conn. 761, 715 A.2d 643 (1998). In *Guess*, our Supreme Court held "as a matter of common law that death as used in the Penal Code includes an irreversible cessation of the functioning of the brain . . . ." Id., 764. Therefore, the subsequent removal of the victim from the respirator is irrelevant if the evidence is sufficient to show that there was an irreversible cessation of the functioning of the victim's brain as a result of the defendant's actions.

"In making a finding of probable cause, the trial court must determine whether the evidence offered would warrant a person of reasonable caution to believe that the accused had committed the charged offense. *In re Keijam T.*, 221 Conn. 109, 115, 602 A.2d 967 (1992); *State* v. *Mitchell*, 200 Conn. 323, 336, 512 A.2d 140 (1986)." *State* v. *Marra*, supra, 222 Conn. 513. "Evidence is not required to rise to a significant level of trustworthiness in order to meet the probable cause standard."

*State* v. *Lewis*, 245 Conn. 779, 808, 717 A.2d 1140 (1998). "The quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. Our cases have made clear [t]hat there is often a fine line between mere suspicion and probable cause, and [t]hat line necessarily must be drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances. . . . We have held, however, that where the evidence offered at a probable cause hearing is insufficient to establish probable cause, the trial court lacks jurisdiction over the defendant's person." (Citation omitted; internal quotation marks omitted.) *State* v. *Marra*, supra, 222 Conn. 513.

At the probable cause hearing, the state introduced a written statement signed by the defendant in which the defendant admitted to the police that he broke into the Caravan. He also admitted that "I got the stereo out of the Caravan real quick. I started to walk back to [Monell], and I heard someone's feet. I saw a white guy running at me, so I threw the radio at the guy to stop him from running after me. The guy kept running after me and tackled me and we both fell to the ground. . . . I was struggling with the guy and started swinging both my fists at the guy and then the guy stopped struggling. When I got back to [Monell's] car, I still had the screwdriver in my hand and figured that I stuck the white guy with the screwdriver."

At that hearing, the state also introduced an autopsy report by Thomas Gilchrist, a forensic pathologist. Gilchrist's autopsy report indicated that the victim sustained a stab wound to the right temporal area. The report indicated that "the wound was rectangular in configuration with minute radiating lacerations at the corners, is obliquely oriented and measures 0.8 cm in length and 0.2 cm in width. . . . The underlying wound track proceeds from right to left and slightly from front

to back for a depth of 12-14 cm into the brain. There is basilar subarachnoid hemorrhage." The report also noted other lacerations and abrasions on the victim. The postmortem diagnoses indicated a "penetrating stab wound of the head" with "laceration of brain," "subarachnoid hemorrhage," and "pulmonary and cerebral edema."

Attached to the autopsy report was a handwritten medical report from Waterbury Hospital made by Steven Burke, a physician.[6] The report indicated that the victim was transported to the Waterbury Hospital emergency room as a "trauma alert." The medical staff noted that he had a head injury and was unresponsive. The medical staff initiated cardiopulmonary resuscitation (CPR). The report indicated that the victim had a heart rate of forty and a blood pressure of eighty. Following CPR and the introduction of medication, the victim's heart rate and blood pressure rose. His pupils were fixed and dilated, and he had a neuroresponse of three on the Glasglow Coma Scale.[7] The victim was brought to the operating room for intracranial pressure monitoring,[8] and his breathing was supported by a ventilator. An electroencephalogram (EEG)[9] taken of the victim

[6] The defendant submitted to this court an affidavit by Polly Stephens, a physician at Waterbury Hospital, which translated the abbreviations and medical symbols used in Burke's report. The state stipulated to the inclusion of Stephens' affidavit.

[7] The Glasglow Coma Scale is "[a] scale for evaluating and quantitating the degree of coma by determining the best motor, verbal, and eye opening response to standardized stimuli. . . . A score of 7 or less is classed as coma . . . ." Taber's Cyclopedic Medical Dictionary (15th Ed. 1985).

[8] Intracranial pressure is "[t]he pressure upon the outer surface of the brain and the inner surface of the skull. . . ." 1 J. Schmidt, Attorney's Dictionary of Medicine (1996), p. I-156. Intracranial pressure monitoring is the measuring of this pressure. J. Schmidt, Attorney's Dictionary of Medicine (March 1996 Cum. Sup., p. 133). The normal pressure of the fluid is less than 15 millimeters of mercury. Id.

[9] Electroencephalogram is "[a] tracing or linear record of the electric currents generated by the brain. . . . It is useful in detecting and localizing brain injuries . . . ." 1 J. Schmidt, Attorney's Dictionary of Medicine (1996) p. E-42.

showed that he had no brain activity. A second EEG was taken on the following day and showed no brain activity.

We conclude that this evidence is sufficient for the trial court to make a finding of probable cause because the evidence offered would warrant a person of reasonable caution to believe that the accused stabbed the victim in the head with a screwdriver and that the wound caused irreversible cessation of the functioning of the victim's brain. Thus, a constitutional violation did not clearly exist and did not clearly deprive the defendant of a fair trial; therefore, the defendant's claim fails under the third prong of *Golding*.

### III

The defendant finally claims that the trial court improperly denied his motion for judgment of acquittal because the evidence was insufficient to prove beyond a reasonable doubt that the defendant was guilty of felony murder. Specifically, the defendant argues that the evidence was insufficient to prove that the defendant caused the victim's death and that the death occurred in flight from the burglary.

"In order to obtain a conviction for felony murder the state must prove, beyond a reasonable doubt, all the elements of the statutorily designated underlying felony, and in addition, that a death was caused in the course of and in furtherance of that felony." *State* v. *Castro*, 196 Conn. 421, 428–29, 493 A.2d 223 (1985). "The standard of review employed in a sufficiency of the evidence claim is well settled. [W]e apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . *State* v. *James*, 237 Conn. 390,

435, 678 A.2d 1338 (1996)." (Internal quotation marks omitted.) *State* v. *Crespo*, 246 Conn. 665, 670, 718 A.2d 925 (1998), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999).

A

The defendant first argues that the evidence was insufficient to establish the element of causation by proof beyond a reasonable doubt. Specifically, the defendant argues that the state did not present any evidence regarding causation because it did not present testimony from medical personnel at Waterbury Hospital regarding the circumstances of the victim's death, did not ask the medical examiner what caused the victim's death and did not introduce the autopsy report and handwritten medical report from Waterbury Hospital in evidence.

"In order for legal causation to exist in a criminal prosecution, the state must prove beyond a reasonable doubt that the defendant was both the cause in fact, or actual cause, as well as the proximate cause of the victim's injuries." W. LaFave & A. Scott, Criminal Law (1972) § 35.

The state produced the following evidence at trial. The state introduced the signed voluntary statement by the defendant in which he admitted that he broke into a Caravan in the parking lot of the Fox Cafe in Waterbury. He admitted that he had a screwdriver, which he used to break into the Caravan window and to remove the stereo. He "got the stereo out of the Caravan real quick." He heard someone coming and "saw a white guy running at [him]. . . . The guy kept running after [him] and tackled [him] and [they] both fell to the ground." The defendant and the victim were struggling. The defendant was swinging both fists at the victim and then the victim stopped struggling. When the defendant returned to the car he realized that he still had the

screwdriver in his hand and "figured that [he] stuck the white guy with the screwdriver." He told Monell that he thought he "might have stabbed the guy." The next day, he threw the screwdriver in a kitchen trash bag, which he tied up and threw in a dumpster.

The officers dispatched to the scene indicated that a white male was on the ground bleeding from the head. A bystander was holding a towel on the wound and there was a lot of blood. The victim was taken by ambulance to Waterbury Hospital.

At trial, the defendant admitted that, during the struggle, he "began to feel around on the ground to look for something to try to knock him off of me with." He found something and "swung it up at him." The victim then fell down on top of him. When he got back to the car the defendant realized that he had a screwdriver in his hand. The defendant described the screwdriver as flat head screwdriver about four to five inches in length with a blue and clear handle.

Gilchrist, a forensic pathologist, testified that the autopsy he performed indicated that the victim had a stab wound in front of his right ear. The wound was eight mm in length, about two mm in width and shaped like an "elongated rectangle with squared ends." There were "little tiny lacerations at each corner of the rectangle about a millimeter or so long and there is some abrasion around the edges of the rectangle."

Gilchrist further testified that a neuropathological examination was done on the victim's brain, a process in which the brain is "fixed and allowed to become more amenable to detailed examination." He testified that the track of the wound in the brain was four inches and the total length of the wound was almost five inches. On the basis of his examination of the skull area, Gilchrist testified that the object causing the wound was relatively blunt and would have required considerable

force to penetrate the skin and bone in that area. He concluded that the stab was caused by a bladed screwdriver.

He further testified that the "wound track passes through and severs the midbrain area which is a very vital area and at that point [the victim] was completely incapacitated. . . . If there was a struggle between two people taking place, it ceased at that point on the part of the victim. . . ." On the basis of these facts, we conclude that it was reasonable and logical for the trier to conclude that the defendant stabbed the victim in the head with the screwdriver.

Gilchrist testified that there were sliding abrasions or brush burns around the victim's left eye. He indicated that these wounds "could well be perimortem" or from around the time of death. In describing the difference between premortem, postmortem and perimortem, Gilchrist stated that "in many of our injuries, we cannot tell the difference between absolute antimortem and absolute postmortem so we use the term perimortem. This would be the case here. The person does not die instantly. They may have vital functions go on even though their brain function is ceased. These wounds here are obviously not postmortem, but, they certainly could well be perimortem." He further testified that the victim "survived in the hospital for a day—a day and a half almost."

In addition, on cross-examination, Gilchrist was asked: "Now, you testified as to the puncture wound in the temple, did you not agree that is the cause of it?" Gilchrist responded: "Yes." Gilchrist was then asked: "Would you not agree nothing else on this body is life threatening in any fashion?" Gilchrist responded: "That's correct." There is nothing in the transcript indicating what the word "it" refers to, nor did the previous questions discuss the victim's death.

Although there is no direct evidence that the stab wound caused the victim's death, "[i]n this process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . Moreover, [i]n evaluating evidence that could yield contrary inferences, the [trier of fact] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . As we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [trier of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Crespo*, supra, 246 Conn. 670–71. "While the [trier of fact] must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the [trier] to conclude that a basic fact or an inferred fact is true, the [trier] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) Id., 671.

We conclude that a rational trier of fact could have reasonably found that the defendant stabbed the victim in the head with a screwdriver and that the screwdriver penetrated four to five inches into the vital midbrain area, causing the victim to be completely incapacitated. The trier could have further inferred that the wound caused brain damage that resulted in the victim's death. "[I]n considering the evidence introduced in a case, [j]uries are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observation and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their conclusions correct." (Internal quotation marks omitted.) *State* v. *Adorno*, 45 Conn. App. 187, 195, 695 A.2d 6, cert. denied, 242 Conn. 904, 697 A.2d 688 (1997). "That the [trier of fact] might have drawn other possible inferences from [the evidence] is not sufficient to undermine its verdict, since proof of guilt must be established beyond a reasonable doubt, not beyond a possible doubt." (Internal quotation marks omitted.) *State* v. *Patterson*, 229 Conn. 328, 332, 641 A.2d 123 (1994).

On the basis of the facts and the inferences reasonably drawn from the facts, viewed in the light most favorable to sustaining the verdict, we conclude that the cumulative force of the evidence established that the defendant caused the victim's death beyond a reasonable doubt.

B

The defendant next argues that "the state failed to prove beyond a reasonable doubt that the death of the victim occurred in the course of, in furtherance of, or in the flight from the crime of burglary." Specifically, the defendant argues that "[t]he state presented no evidence to controvert the defendant's testimony that he

terminated his flight when he realized the victim was pursuing him."

The state introduced the defendant's written, signed statement to the police in evidence at trial. The defendant admitted in his statement that "I got the stereo out of the Caravan real quick. I started to walk back to [Monell], and I heard someone's feet. I saw a white guy running at me, so I threw the radio at the guy to stop him from running after me. The guy kept running after me and tackled me and we both fell to the ground. . . . I was struggling with the guy and started swinging both my fists at the guy and then the guy stopped struggling. When I got back to [Monell's] car, I still had the screwdriver in my hand and figured that I stuck the white guy with the screwdriver." At trial, however, the defendant testified that he tried to give himself up and tried to return the radio to the victim.[10]

We note that "[t]he [jury] is free to juxtapose conflicting versions of events and determine which is more

---

[10] The defendant testified as follows:

"Q. What happened next, Jamel?

"A. I turned, and I saw this man running at me.

\* \* \*

"Q. What did you say to him, if anything?

"A. I said you caught me. I give up.

\* \* \*

"Q. What did Mr. Walsh say when you say you've caught me, I give up?

"A. He had screamed at me. He screamed, 'Fuck you, nigger, I'm going to kill you.'

"Q. What did you do when you heard that?

"A. I tried to throw the radio back to him.

"Q. How did you try to throw the radio back to him?

"A. I had the radio in my hands, both hands, and threw it underhand to him. I didn't want to break the radio. . . .

"Q. What did you say when you tossed the radio to him underhand?

"A. I said, here, take it. I give up.

"Q. How did he act when you tossed the radio toward him?

"A. He batted it back down on the ground.

\* \* \*

"Q. How did you feel?

"A. I was scared. I just turned and ran."

credible. . . . It is the [jury's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [jury] can . . . decide what—all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Pauling*, 47 Conn. App. 483, 487, 706 A.2d 981 (1998). Therefore, the jury was free to believe the defendant's written statement and to reject his testimony at trial. Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence was sufficient to prove beyond a reasonable doubt that the victim's death occurred in the course of, in furtherance of, or in the flight from the burglary.

We conclude that the trial court properly denied the defendant's motion for judgment of acquittal because there was sufficient evidence to prove beyond a reasonable doubt that the defendant committed felony murder.

The judgment is affirmed.

In this opinion the other judges concurred.