[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON PETITIONER'S WRIT OF HABEAS CORPUS
 Procedural Background
On June 30, 1992, after a trial to a jury, Barry, J., presiding, the petitioner was found guilty of the crimes of capital felony, arson murder, felony murder, murder, arson in the first degree, assault in the first degree, sexual assault in the first degree, sexual assault in the third degree, and kidnaping in the first degree. Following the penalty phase of trial, the jury determined that the state proved an aggravating factor beyond a reasonable doubt and that the petitioner proved a mitigating factor by a preponderance of the evidence. On September 8, 1992, the petitioner was sentenced to life in prison without the possibility of parole. The petitioner appealed. On July 16, 1996, the CT Page 10852 Supreme Court affirmed the judgment of conviction. State v. Lapointe,237 Conn. 694, 678 A.2d 942 (1996). Thereafter, the U.S. Supreme Court denied the petitioner's petition for writ of certiorari. Lapointe v.Connecticut, ___ U.S. ___, 117 S.Ct. 484, 136 L.Ed.2d 378 (1996). This habeas corpus proceeding followed.
 Factual Background
In the petitioner's appeal to the Connecticut Supreme Court, the court recited the pertinent facts of this case in its opinion as follows: (seeState v. Lapointe, supra, pp. 696-702).
The jury reasonably could have found the following facts:
On March 8, 1987, the defendant called the emergency telephone number, 911, to report a fire at the Manchester apartment of the victim, Bernice Martin, his wife's eighty-eight year old grandmother. Manchester firefighters entered the smoke-filled apartment and found the victim lying on the floor approximately six to eight feet from a burning couch. The victim was only partially clad and a piece of fabric was tied tightly around her neck. Other fabric was tied loosely about her wrists. The firefighters noted a bloodstain on the bed in the apartment. Paramedics who arrived at the scene attempted unsuccessfully to resuscitate the victim and subsequently transported her to a hospital where she was pronounced dead shortly after her arrival. Medical personnel did not examine the victim for sexual trauma on the night of her death and did not provide the family with any information pertaining to the cause of death. A priest in attendance, however, did tell family members gathered at the hospital that the victim had been stabbed.
A knife blade and a melted brown plastic knife handle were found in the victim's apartment. The victim's underwear was found on the floor of the apartment to the right of the bed. No latent fingerprints were discovered at the scene due to fire and water damage. It was determined that the fire in the victim's apartment had three points of origin — the couch, near which the victim had been found, and two towels that were hanging in the kitchen. There was no evidence that an accelerant had been used to hasten the fire's progress. The couch, which had extensive fire damage, was tested and found to burn at a very slow rate and to emit copious amounts of smoke.
At approximately midnight on the night that the victim's body was found, Detective Edward Wilson of the Manchester police department interviewed the defendant. The defendant told Wilson that on March 8, from approximately 2:00 to 4:00 p.m., he had visited the victim at her apartment with his wife, Karen, and his son, Sean. The defendant also told CT Page 10853 Wilson that after the family had returned home from their visit he had not left the house until his wife's aunt, Natalie Howard, had called between 7:30 and 7:45 p.m., asking him to check on the victim because she was not answering her telephone. The defendant further told Wilson that, while he was walking to the victim's apartment in order to check on her, he had smelled smoke. He also said that after arriving at the apartment and receiving no answer to his knock, he had attempted to enter both the front and the back doors but that both doors were locked. The defendant stated that the back door felt warm to the touch.
The defendant said that he then had gone to the apartment of Jeannette King, a neighbor of the victim, to call his wife and Howard. Despite having smelled smoke and having felt the heat of the door to the victim's apartment, the defendant made no effort to secure emergency assistance at that time. Rather, he walked to King's apartment and knocked on the door furthest from the victim's apartment. When King opened the door, the defendant greeted her calmly and without any sign of urgency. The defendant asked King for change for a quarter so that he could use a pay telephone down the road. King, who had met the defendant previously, invited him to use her telephone. He did so, calling both his wife and Howard and telling them that the victim had not answered her door and that she must have been sleeping. He never mentioned to either his wife or Howard that he had smelled smoke or that the door to the victim's apartment had been warm to the touch. Howard reminded the defendant that the victim never went to bed as early as 8:00 p.m. and told him that she was going to the victim's apartment immediately to check on the victim. The defendant then left King's apartment and returned to the victim's apartment. The defendant claimed that upon returning to the victim's apartment, he saw smoke emanating from under the eaves. He then returned to King's apartment, again knocked on the more distant of the two doors, and, when admitted, called the 911 emergency telephone number.
On March 9, an autopsy of the victim's body by the medical examiner revealed that the victim had suffered a three inch deep stab wound to her abdomen and ten less severe stab wounds to her back. The medical examiner also determined that the victim had been strangled and that she had sustained premortem first and second degree burns. The cause of death was determined to be a combination of strangulation and smoke inhalation. The autopsy also revealed, for the first time, that the victim had suffered extensive hemorrhaging as well as lacerations and contusions to her vagina.
The jury further could have found that a stain on the victim's bedspread was human semen from a person who was a secretor with Type A blood. The defendant has Type A blood and is a secretor. The semen stain also was found to contain no sperm, which is consistent with the semen of CT Page 10854 a person who has had a vasectomy. The defendant had a vasectomy after the birth of his son in 1979. On March 9, before any information regarding a possible sexual assault became known to the police or the public, the defendant stated in a conversation with Eileen Giacalone, a friend of the Lapointe family, that "it was a shame they killed an old lady, but they didn't have to rape her, too." When asked in a June, 1989 interview by Detective Paul Lombardo how he had learned that the victim had been sexually assaulted, the defendant responded that he had been informed by a doctor at the hospital on the night of the murder that the victim had been strangled, stabbed and sexually assaulted. The medical personnel who had attended to the victim unanimously testified, however, that they did not check the victim for sexual assault trauma when she was at the hospital that night and, further, that it would have been highly unusual for them to have done so under the circumstances. Other family members who had been present at the hospital corroborated the testimony of the medical personnel who said that there had been no mention of sexual assault at the hospital.
On March 9, Officer Wayne Rautenberg interviewed the defendant at the Manchester police station. During the interview, the defendant exhibited considerable curiosity concerning the results of the autopsy and asked if there had been causes of death other than smoke inhalation. The defendant's curiosity was further manifested by his persistent questions to Wilson and Captain Joseph Brooks of the Manchester police department concerning the status of the investigation and whether he was a suspect. These inquiries were made during numerous chance encounters that the defendant had with the officers in Manchester between the dates of the victim's death and the defendant's arrest.
The police investigation of the victim's death remained open and unresolved until March, 1989, when, due to internal changes at the Manchester police department, Lombardo was assigned to the case. Because the investigation had been dormant for some time, Lombardo decided to reinterview all those persons who had been interviewed previously. For that purpose, Lombardo called the defendant in June, 1989, and asked if he would submit to another interview. The defendant initially responded, "Why, am I a suspect?" The defendant, however, acquiesced to Lombardo's request and, on June 8, walked to the police station where he spoke with Lombardo. At that time, in order to check the defendant's blood type, Lombardo asked the defendant for a saliva sample, which the defendant provided. The defendant's wife, in response to a direct question and in the defendant's presence, had previously told Sergeant Michael Ludlow that the defendant's blood was Type 0. An analysis of the saliva sample, however, revealed that the defendant's blood type was in fact Type A and that he was a secretor. These results were consistent with the seminal stain found on the victim's bedspread. During the course of his CT Page 10855 investigation, Lombardo also belatedly learned from King that she had seen the defendant walking his dog near the victim's apartment shortly after 7:00 p.m. on the night of the victim's death.
Inconsistencies in the defendant's version of his activities on the evening of March 8, 1987, and the defendant's prescience that the victim had been sexually assaulted led Lombardo to become increasingly suspicious. Therefore, Lombardo again requested that the defendant come to the police station on July 4, 1989. At the time the defendant was interrogated and gave several incriminating oral and written statements to Lombardo, Detective Michael Morrissey and Brooks, respectively. Morrissey also interviewed the defendant's wife on the same day, at which time she conceded that the defendant had left their house on the night of the victim's death in order to walk their dog. This was contrary to what both she and the defendant had told the police previously, i.e., that the defendant had not left the house after the family returned from their afternoon visit with the victim until the defendant left after talking to Howard. On the basis of, among other evidence, the defendant's admissions made on July 4, 1989, an arrest warrant was issued, pursuant to which the defendant was taken into custody on July 5, 1989.
 Petitioner's Claims
The petitioner brings this action in five counts. (See Fifth Amended Petition.) The counts are as follows:
Count one — actual innocence;
Count two — prosecutorial misconduct;
Count three — discrimination on the basis of physical and mental disability;
Count four — ineffective assistance of trial counsel;
Count five — ineffective assistance of appellate counsel.
The court will examine each claim as to the evidence and proof offered by the petitioner and thereafter discuss the court's factual findings applying them to applicable prevailing law.
 Count one — actual innocence
The petitioner asserts that the evidence presented at the habeas hearing establishes that he did not have the physical and intellectual skills necessary to carry out and conceal the crimes for which he has CT Page 10856 been convicted. The basis for this claim is a disability from hydrocephalus, a brain disorder from which the petitioner has suffered since childhood. He further argues that new scientific evidence, not reasonably available at the time of trial demonstrates his inability to commit these crimes. In addition, he claims that this disability prevented his knowingly and voluntarily participating in the police interrogations which resulted in statements used to convict him at trial.
 APPLICABLE LAW
Both parties agree that to prevail on a claim of "actual innocence" the petitioner must persuade the habeas court by clear and convincing evidence that he is actually innocent of the crime of which he stands committed. This is an "essentially factual" determination, "based on [the habeas court's] assessment of the credibility of particular witnesses." Millerv. Warden, 242 Conn. 745, 789 n. 29 (1997). In addition, the petitioner must establish that, after considering "both the evidence produced in the original criminal trial and the evidence produced in the habeas hearing," and the references drawn therefrom . . . no reasonable fact finder would find the petitioner guilty." Id at 791-92. The second determination is a "legal determination." Id at 805. See also Summerville v. Warden,229 Conn. 397, 422 (1994).
The respondent asserts that a claim of actual innocence, when raised in a habeas corpus proceeding, must be based on newly discovered evidence. To be considered "newly discovered," "the evidence must be such that it is not cumulative, was not available to the petitioner at his criminal trial and could not have been discovered prior to the criminal trial through the exercise of due diligence." In Clarke v. Commissioner ofCorrection, 249 Conn. 350, 375-58 (1999), our Supreme Court has left the absolute requirement of "newly discovered evidence" an open question in our habeas jurisprudence "until the actual outcome of the case is likely to depend on the answer to the legal question." Id at 351.
Inasmuch as the actual outcome of these claims will not depend on whether the evidence offered in this instance was newly discovered, this court will make no finding as to petitioner's burden in this regard, because the court finds that petitioner has otherwise failed to meet his burden of proof as to his claim of actual innocence.
EVIDENTIAL ANALYSIS AND CONCLUSION
The petitioner's claim as to proof of actual innocence is based on two separate theories. The first is that the petitioner "did not have the physical and intellectual skills necessary to carry out and conceal the CT Page 10857 crimes at issue." He claims that he is and was seriously disabled as a result of a childhood hydrocephalus.
The second theory of actual innocence is that due to the petitioner's disability he did not "knowingly, intelligently and/or voluntarily participate in interrogations with the Manchester police." In addition, the petitioner asserts that he "did not have the ability to testify reliably."
A. Petitioner's alleged inability to commit the crime.
Both parties agree that the petitioner is affected with a congenital brain malformation known as Dandy-Walker syndrome. The National Institute of Health has defined this as a ". . . malformation involving the fourth ventricle and cerebellum. It is defined as an enlargement of the fourth ventricle, an absence (partial or complete) of the cerebellum vermis (the narrow middle area between the two cerebral hemispheres), and cyst formation in the posterior fossa (the internal base of the skull). Hydrocephalus (increased intra cranial pressure) may also be present.
Although petitioner acknowledges that this diagnosis was made prior to his 1992 trial, he claims that newly discovered evidence as to the scientific understanding of the consequences of the syndrome proves his innocence.
In support of this claim the petitioner offered testimony of two experts, Stewart Mostofsky, M.D. and Maureen Dennis, PhD.
Dr. Mostofsky testified that the petitioner has cognitive deficiencies, and that his abnormalities have been confirmed by MRI studies (not performed in 1992).
He found that Mr. Lapointe had short term memory dysfunction resulting in his inability to plan or organize action.
Dr. Mostofsky further found that the petitioner had severe abnormalities in both axial and fine motor coordination, resulting in difficulty performing such tasks as buttoning, handwriting and manipulating small objects. In essence, he is clumsy and poorly coordinated.
Testing known as Rey Osterrieth demonstrated that Mr. Lapointe has "difficulty with organizing and planning a series of movements."
Dr. Mostofsky also testified that the petitioner had severe difficulty with his memory, i.e., the ability to hold information in the mind and CT Page 10858 manipulate it.
Dr. Dennis testified at length as to similar deficiencies resulting from this congenital brain malfunction. She described the petitioner's condition as affected by severe brain damage resulting in an inability to comprehend mathematics, reading and to engage in social discourse. Severe motor problems were also observed.
Despite these conclusions, Dr. Dennis acknowledged that Mr. Lapointe was intellectually average but had limitations in the area of motor function and particularly "executive function" which she defined as "the ability to understand abstract ideas, the ability to solve problems flexibly, to change prospective . . . planning; the ability to use . . . memory effectively in real time."
The petitioner and the respondent differ as to whether the testimony of Drs. Mostofsky and Dennis was newly discovered and highly significant or was instead merely cumulative.
In this regard, it is interesting to note Justice Berdon's dissent in this case regarding the testimony of Dr. Phillips who testified at the 1992 trial. His summary is as follows:
Phillips observed in her report.that the defendant "is inclined to sometimes respond arbitrarily to conversation or questions [that] he does not fully understand. [He] tends to be quite concrete and inflexible in his reasoning, understanding situations in a narrow and set way, and having considerable difficulty adopting alternative interpretations of events, or even making sense of unfamiliar events. He tends to be confused by a multiplicity of stimuli, whether dealing with verbal or nonverbal situations, and to then respond in a rather disorganized fashion . . . He is, in sum, a man functioning at the lower end of the average range of intelligence who demonstrates particular difficulty with cognitive flexibility, expressive and receptive vocabulary, and with detail discrimination. Although able to manage many everyday tasks, [the defendant] is narrow, concrete and inflexible in his learning and functioning ability and apt to be rigid and easily frustrated in dealing with unfamiliar situations. . . . Neuropsychological testing demonstrates the presence of attentional and sequencing deficits, dysnomia, perseverative errors, impulsivity, significant constructional deficits, evidence of proactive inhibition and impaired facial memory. [The defendant's] pattern of deficits on neuropsychological deficits were seen as consistent with right frontal and posterior cerebral dysfunction, as well as with the experience of Dandy-Walker Syndrome with multiple cerebral shunts." Phillips concluded that the defendant "is easily overwhelmed by emotions or by unfamiliar situations and seeks to limit CT Page 10859 his experiences in order to avoid such discomfort. When thus overwhelmed, [the defendant] is likely to defer to environmental cues over his own judgment in order to find a quick way out of the discomfort he experiences. [The defendant] appears extremely reactive to authority, tending both to rely upon authority figures for guidelines for behavior and to be intimidated and easily threatened by them. . . . While not thought disordered, the interplay of [the defendant's] cognitive and emotional limitations severely constrict his capacity for coping with situations which are novel or at all stressful or emotionally-charged."Lapointe, 237 Conn. at 740-741 (Berdon, J., dissenting).
What is apparent to this court is that essentially similar evidence of the petitioner's disabilities was before the jury in the trial of this case. The evidence addressed at the habeas hearing, while demonstrating a more thorough and deeper understanding of Dandy-Walker, presented nothing of such significance as to warrant a finding by this court that such evidence was any more than cumulative. It is incumbent on the habeas court to consider all of the evidence in the case, i.e., that presented at trial and that presented during the habeas proceeding. If, upon this consideration the petitioner proves by clear and convincing evidence and inferences drawn therefrom that no reasonable fact finder would find him guilty, the court must find in his favor. Miller, supra, 791-792. The "clear and convincing standard "forbids relief whenever the evidence is loose, equivocal or contradictory." Id 795
What is conclusory on this issue in this proceeding is that nowhere in the testimony of Drs. Mostofsky and Dennis did they testify (nor were they asked) whether the petitioner had the physical and mental capacity to have committed the crimes of murder, rape, and arson, or further to plan or disguise his participation in these crimes.
Although the petitioner claims that he could not have committed these crimes because of his brain disorder, he has presented to this court no such evidentiary proof. He has argued at length as to factual inconsistencies which would demonstrate his innocence. The habeas court is not charged with finding the jury to have made an error in its guilty findings. It is charged with examining all of the evidence in both the trial and habeas hearings and to determine from all of this evidence whether the petitioner, because of his disability was unable to commit these crimes.
The court finds that he has failed, even by the most minimal standard, and certainly by the required standard of clear and convincing evidence, to prove this allegation.
B. Petitioner's alleged inability to knowingly, intelligently and/or CT Page 10860 voluntarily participate in police interrogation because of his disability.
In addition to the testimony of Dr. Mostofsky and Dr. Dennis, the petitioner relies on the testimony of another expert, Dr. Richard Leo. Dr. Leo's expertise is in the field of criminology and social psychology. He has observed, according to his testimony, hundreds of police interrogations.
Dr. Leo's testimony, based on his review of the trial transcript, concluded after a lengthy analysis, that the petitioner's statements "are inconsistent with what I would expect based on my research and experience in this area from a true confessor. Instead, they suggest evidence of a false confession or unreliable statements." He further opined that the conduct of the police, especially the nine and one-half hour interrogation "would lead me as a researcher to make the judgment that coercion was present in this interrogation."
This court cannot credit Dr. Leo's testimony, because in rendering his opinion, he based it on his disbelief of the police version of events. This, of course, is contrary to our law. An expert is not permitted to offer opinions on relevant events based on his personal assessment of another witness' testimony. United States v. Scop, 846 F.2d 135, 142-143
(2d Cir. 1988). State v. Butler, 36 Conn. App. 525, 530-531 (1995).
This court has already discussed the testimony of Drs. Mostofsky and Dennis in holding that their testimony did not demonstrate anything of significance relating to the petitioner's mental condition, but was cumulative in nature. There was no credible evidence in the habeas trial that the petitioner did not have the mental capacity to make the statements which he gave.
The petitioner's real argument, however, is that his statements were involuntary under the federal constitution. In its review of this case, our Supreme Court has painstakingly analyzed the facts surrounding the circumstances of the confessions. It would serve no great purpose for this court to repeat that portion of the opinion. It is sufficient to point out that the court described at length that "for a confession to be deemed "involuntary' and thus inadmissible at trial "[t]here must be police conduct, or official coercion, causally related to the confession . . ." (Citations omitted).
Particularly, the court cited Colorado v. Connelly, 479 U.S. 157,107 S.Ct. 515, 93 L.Ed.2d 473 (1986). In that case the U.S. Supreme Court held that "while mental condition is surely relevant to an individual's susceptibility to police coercion mere examination of the confessor's state of mind can never conclude the due process inquiry." State v.CT Page 10861Lapointe, super 728-735.
What the petitioner seeks to do in this habeas petition is to have this court, in effect, decide that our Supreme Court's analysis was flawed and thus incorrect. That, of course, is not the function of the habeas court and it declines to do so.
This court, therefore, finds that Mr. Lapointe has failed in his burden to prove that the evidence he offered at the habeas trial demonstrates that he did not have the mental ability to testify reliably or that he did not knowingly, intelligently and/or voluntarily participate in the police interrogation.
 Count Two — Prosecutorial Misconduct
Although this count contains a multiplicity of claims concerning prosecutorial misconduct, the petitioner, in his brief has focused on only the following allegations. The other claims will be deemed to have been abandoned.
Those pursued in this count are:
1. The alleged suppression by the prosecution of Detective Lombardo's notebook;
2. The allegation that the prosecution engaged in a pattern and practice of suppression or late disclosure of evidence;
3. The allegation that the prosecution's offer of improper demeanor evidence prejudiced the outcome.
The court will discuss these claims separately.
 THE CLAIMED SUPPRESSION OF DETECTIVE LOMBARDO'S NOTEBOOK
The U.S. Supreme Court in Brady v. Maryland, 373 U.S. 83, 87-88 (1963) decided that it is a violation of due process to fail to disclose to an accused evidence favorable to him if the evidence is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."
The petitioner, in this case, asserts that the prosecution failed to turn over to him a notebook written by Detective Paul Lombardo, thus constituting a Brady violation.
It is the opinion of this court that for the reasons discussed below, CT Page 10862 the court is satisfied that the petitioner has not demonstrated that he is entitled to relief under Brady for the prosecutions failure to turn the notebook over to the petitioner.
The Lombardo notebook, was not turned over to the defense until this habeas hearing. That the notebook existed, however, was known to the defense since the probable cause hearing in August of 1989. The contents were described by Detective Lombardo, at that time, as containing all of his notes from the case. The court, thereupon, pursuant to petitioner's counsel's request directed Lombardo to keep his notes secure "until such time as they may be required when this case comes to trial." No request was ever made, thereafter, by counsel to see the notebook.
There is no Brady violation when, under the facts of this case, defense counsel knew of the notebook three years prior to trial and never requested to see it. Wainwright v. Sykes, 433 U.S. 72, 97, S.Ct. 2497,53 L.Ed.2d 594 (1977). Stockton v. Murray, 41 F.3d 920, 927 (4th cir. 1994) cert. denied, 515 U.S. 1187, 116 S.Ct. 37, 132 L.Ed.2d 918
(1995). Our Supreme Court has held that in these circumstances a defendant must avail himself of the opportunity to object or he has waived the objection. State v. Evans, 165 Conn. 61, 66 (1973).
Even if there had been no waiver in this case, the petitioner must show that the evidence suppressed was favorable to the defense and that it was material. State v. Milner, 206 Conn. 512-539-40 (1988). This has been interpreted to mean that the undisclosed material would create a "reasonable probability" of a different result. Kyles v. Whitley,514 U.S. 419-433-34 (1995).
The petitioner at the habeas trial has cited various portions of the notebook to assert that the piecemeal notes of Detective Lombardo could have been in conflict with the written statements of the petitioner and could have materially helped his case if he had been allowed to cross examine Detective Lombardo on those notes at the trial.
While it is true that a cross examination might possibly have yielded "fruit" to the petitioner, there has been no showing that it would have. Counsel argues a host of speculation in support of this claim but this court cannot find such support in the testimony adduced at the habeas trial.
What is clear is that the notes taken were fragmentary, designed to help the writer by recording salient points and enlarging on them when his report was written. It is also clear that the reports contained the same points and information in the notebook as well as additional information in the final report. CT Page 10863
In the context of the record, although some of the "withheld material" could have been helpful in cross examination, there was other evidence of the petitioner's guilt including three written confessions, the fact that human semen stain found contained no sperm which was consistent with that of the petitioner who had had a vasectomy. It also showed that it was from a person with type A blood. The petitioner has type A blood. Additionally, the petitioner told another witness that the victim had been raped, a fact known only to the police.
Further discussion of the contents of the notes at this point would serve no useful purpose because this court cannot find them exculpatory in any sense. While it is true that if the time sequences of the petitioner's statements in the notes were construed as the petitioner wishes them to be construed, they might be deemed exculpatory. However, no questions were put to Detective Lombardo as to the meaning of the various words in the notebook, the court cannot find anything in the notebook that it can hold to be exculpatory based on the plain meaning without a different interpretation from the author. This court finds, that the notes were mere points that Detective Lombardo wished to highlight and were not statements in any sense of the word. The court accepts Detective Lombardo's testimony that the notes were organizational, and that he never intended them to be his version of what occurred during his interrogation of the petitioner. Again, because the information allegedly suppressed was not shown to be exculpatory, there was no Brady violation. Kyles v. Whitley, supra., State v. Pollitt,205 Conn. 137, 143 (1987).
 Count Three — Discrimination on the Basis of Physical and Mental Disabilities
The petitioner argues that his disabilities, both physical and mental, were exploited by the police and prosecution, therefore violating his equal protection rights under Article First, Section 20 (as amended by Articles V and XXI) of the Connecticut Constitution.
The petitioner further alleges such a violation under theFourteenth Amendment of the United States Constitution.
These claims were not argued during the habeas trial nor does petitioner cite any authority to support his position at this time.
First, as it was noted, these constitutional claims were never made at trial. In addition, they were not made during the appeal of this case.
Our Supreme Court has stated that habeas review of constitutional CT Page 10864 claims never raised in the trial court violate our rules of practice and would thrust too great a burden on our criminal justice system. Johnsonv. Commission of Correction, 218 Conn. 403, 417 (1991).
To raise such a claim, the petitioner must meet the standard established in Johnson for such review, 417-419. The petitioner must show good cause for the failure to preserve a claim at trial and actual prejudice resulting from the constitutional violation. Here, the petitioner has shown neither. See also Giannotti v. Warden,26 Conn. App. 125, 128-129 (1992).
Our Supreme Court has held on the appeal of the petitioner's conviction that his confessions were voluntary and further that he was not mentally retarded and suffered from no thought disorder or psychosis. State v.Lapointe, supra, 694.
The evidence at this hearing similarly presented such a picture through Dr. Dennis who summarized his mental condition, She found Mr. Lapointe to be intellectually average, but impaired in the area of motor cognitive and executive function. There was no evidence that the petitioner could not function normally in society.
Petitioner has presented no credible evidence that the police took advantage of his disabilities.
He hasn't presented to this court any analysis or case law to support his claim of discrimination. Indeed, he has failed to adequately brief this claim and the court will treat it as abandoned. Chavlin v. Balkus,189 Conn. 445, 447 n. 4 (1983), State v. Marsale, 43 Conn. App. 527,538, (1996).
 Count IV — Ineffective Assistance of Trial Counsel
Petitioner claims that he was deprived of his state and federal constitutional rights to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution, and Article First, Section Eight of the Connecticut Constitution.
The United States Supreme Court adopted the federal standard for evaluating claims of ineffective assistance of counsel in Strickland v.Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This standard was further adopted by the Connecticut Supreme Court inLevine v. Manson, 195 Conn. 636 (1985).
Both the federal and state standards require the petitioner to prove by CT Page 10865 a fair preponderance of the evidence that counsel's performance fell below the level of competence. In addition he must show that the deficient performance prejudiced the defense. Strickland, 687. Copas v.Commissioner of Correction, 234 Conn. 139, 155, (1995); Daniel v.Commissioner of Correction, 57 Conn. App. 651, 668 (2000). Flawlessness is not required. Moreover, courts must be highly deferential in their scrutiny of counsel's performance and "must indulge a strong presumption that counsel's conduct fails within the wide range of reasonable professional assistance." Strickland, 689.
In Bunkley v. Commissioner of Correction, 222 Conn. 444, 456, n. 14 (1992), the Connecticut Supreme Court, quoting Strickland defined prejudice in terms of that necessity as follows: "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a fair result . . . Prejudice result[s] from a breakdown in the adversary process thatrenders the result unreliable."
Such prejudice may be established by the petitioner by a showing that but for counsel's errors there is a reasonable probability that the outcome would be different, i.e., that the fact finder would have a reasonable doubt concerning guilt. Fair v. Warden, 211 Conn. 398, 408, (1989).
Under this standard the court will analyze the four claims of ineffective assistance which the petitioner has briefed. The remaining claims in count four will be treated as abandoned.
1. Failure to Procure the Lombardo Notebook
The petitioner claims that trial counsel's failure to obtain the Lombardo notebook constituted ineffective assistance of counsel because it could have been effectively used to cross-examine Detective Lombardo, looking for inconsistencies "as testified to by petitioner's expert witness, Attorney Ira Grudberg."
Because trial counsel knew that the notebook existed and failed to act on it he fell below the standard for a trial attorney according to Grudberg.
Of significance, however, is the fact hat Attorney Culligan, who represented the petitioner at trial, was never questioned as to why he did not ask for the notebook.
Unfortunately, the court is left to speculate on this question. It is CT Page 10866 true, of course, that Culligan may not have been entitled to the notebook. Under Practice Book § 40-14 (formerly § 746), memoranda or other internal documents of law enforcement officers are not disclosable. They may be discoverable if they are signed or adopted as statements by the officer, and after he testifies. State v. Belle,215 Conn. 257, 266 (1990); State v. Hinton, 196 Conn. 289, 300 (1985).
Attorney Culligan, as respondent has demonstrated in the state's brief, had, during the trial of this case, pointed out to the court that the defendant usually is not entitled to investigatory notes. SH Transcript (1/17/92) at 26-27.
Of course, if the material were exculpatory pursuant to Practice Book § 40-13, it would be disclosable. This court, having examined the notebook, and evaluating the evidence at this hearing simply cannot find that the notebook was exculpatory.
Attorney Culligan, it must be presumed, acted reasonably and this court cannot find that his failure to ask for the notebook was deficient.
Secondly, as the court has previously discussed under Count II, prosecutorial misconduct, the contents of the notebook reveal nothing so favorable as to create a reasonable probability that if counsel had obtained them the result would have been different.
2. Failure to Call Appropriate Experts
Petitioner claims that defense counsel was ineffective because he failed to call experts who would have testified as to petitioner's extensive disabilities. He points to the trial testimony of Dr. Anderson, who testified that petitioner had a cat scan report indicating a "normal" brain and, further his failure to call a neurologist, Dr. Duncan until the penalty phase.
Petitioner also relies on Atty. Culligan's acknowledgment at the habeas trial that he relied on Dr. Anderson's report "to the detriment of my client." He further pointed to Culligan's testimony that he "believed today [the psychologist] did not have the appropriate professional competence or expertise to adequately evaluate a person . . . with Mr. Lapointe's history."
The record in this case is clear that defense counsel hired many experts in his effort to persuade the jury that his client had a severe disability because of his Dandy-Walker syndrome.
He brought to the stand Drs. Kenneth Selig, a forensic psychiatrist, CT Page 10867 Dr. Anne Phillips, a clinical psychologist, Dr. Walter Phillips, a psychologist, Dr. Geraldine Cassens, a neuropsychologist, Dr. Gus Anderson, a neurologist, and Dr. Donald Grayson, a psychiatrist. Reports were obtained from those experts as well as Drs. Taylor and Tucker. Culligan acknowledged at the habeas hearing that he believed at the time of trial that they were competent in their field.
Because some of the testimony of these experts was disappointing was certainly not the fault of Culligan. As Strickland, supra 629, points out "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time. His reliance on their testimony certainly fell within acceptable limits.
It is interesting to note that the petitioner called three additional experts at the habeas trial. This court has previously observed that the testimony of those experts, while demonstrating a more thorough and deeper understanding of Dandy-Walker did not offer any proof of the petitioner's innocence or that any statements gave were as a result of duress or were unreliable. This court cannot find that Attorney Culligan failed to call appropriate experts nor that he was deficient for relying on those he called.
3. Failure to Use Existing Evidence to Argue Reasonable Doubt
The petitioner claims that trial counsel should have offered evidence that a neighbor's screen door was cut arid that a man was seen running from the victim's apartment complex around 8:00 p.m. on the night of the crime, i.e., that there was third party culpability in this case.
It appears, however, that such evidence would have been inadmissible because to be admissible, there must be some evidence that the third party is connected to the crime. State v. Boles, 223 Conn. 535, 549-50,613 A.2d 770 (1992). At the habeas trial, the petitioner offered only the evidence of a man running from the scene. Clearly this evidence was insufficient for admission. No evidence was offered concerning the neighbor's cut screen door. Inasmuch as this evidence would be similarly inadmissible, the petitioner has failed to prove or explain to the court how counsel was in error in not presenting such testimony. State v.Talton, 197 Conn. 280, 297 (1985).
Petitioner also argues that trial counsel was ineffective for failing to argue that four items admitted into evidence demonstrated reasonable doubt as to his guilt. CT Page 10868
a. Gloves
Two men's gloves found at the scene and admitted into evidence contained hairs similar to the victim's. The petitioner was not asked about the ownership of the gloves. Attorney Culligan was not asked about the gloves at the habeas trial. The court, therefore, is left to speculate why Attorney Culligan did not argue about the ownership of the gloves. It can only conclude, indulging in the strong presumption that his conduct was within the range of acceptable professional assistance, that this act was not proven to be ineffective conduct.
b. Petitioner also alleges an ineffective assistance claim due to trial counsel's failure to argue to the jury that hairs of unknown origin and a knife known not to be the murder weapon were found at the scene.
Of course, these items were in evidence and available to the jury. Culligan was never asked at the habeas trial about these items so, again, the court was left to speculate about petitioner's claim. The court is unable to find that petitioner has sustained his burden to show that counsel's actions were not strategic in nature and further that the result in this case would probably have been different if he had argued to the jury concerning them.
c. Blunt object
Most of petitioner's argument on this point centers around the medical examiner's testimony that lacerations and contusions in the victim's vaginal area were due to blunt trauma. Attorney Grudberg interpreted this to mean that the trauma was caused by a blunt object. Dr. Katznelson, testifying at the habeas hearing, said that an erect penis is a blunt object capable of inflicting those injuries.
Attorney Grudberg criticized Attorney Culligan's argument to the jury for not raising the issue as to whether or not the injury was caused by a foreign object or penile penetration as petitioner had confessed. Culligan claimed that there was no sexual intercourse because of the blunt object testimony. This was presumably a trial tactic employed by Culligan to have the jury find that there was no sexual intercourse by pointing to Dr. Katznelson's testimony that blunt trauma caused the vaginal injuries. Culligan's decision not to question that testimony in respect to the possibility that a penis could have caused the injury appears at this juncture to be acceptable strategy, although the jury obviously was not convinced by his argument.
No explanatory testimony was elicited from Attorney Culligan at the habeas hearing as to why he chose this tactic. Here, again, Strickland's
CT Page 10869 holding that hindsight is not the view to take in appraising counsel's performance must lead this court to conclude that this claim of ineffective assistance falls short of the required standard of proof. (Strickland, at 689 opines that an unsuccessful defense is too easily described by an expert as unreasonable).
4. Failure to Object to Improper Demeanor Evidence
Petitioner argues that Attorney Culligan fell below the standard of a defense attorney when he failed to contest the admission of testimony regarding petitioner's demeanor. This testimony alluded to Lapointe's demeanor as being unlike that of an innocent person, i.e., his sitting in a chair in a runner's position, " was similar to one who was about to run (from the police interrogation).
Here, still again, Culligan was never asked to explain his non-action. The court must speculate as to his reasons, but as respondent has pointed out, Culligan mocked this testimony (of Detective Lombardo). His remarks to the jury were obviously designed to convey that such testimony was patently ridiculous as to any indication of petitioner's guilt.
It should be noted that despite Attorney Grudberg's claims of several deficiencies as to Culligan, he testified at the habeas hearing that "in most respects, they (Culligan and (co-counsel) Cosgrove) performed competently." HT 3/23/00 R53.
Deferring again to the Strickland presumption of "reasonable professional assistance," this court cannot find that Culligan's argument was not sound strategy. It was not ineffective assistance. See also,Johnson v. Commissioner of Correction, 34 Conn. App. 153, 155 (1994).
 Count V — Ineffective Assistance of Appellate Counsel
In his claim of ineffective assistance of appellate counsel, petitioner fires a broadside of allegations attacking the conduct of appellate counsel. In his brief, however, he limits these claims to the following:
(a) providing an erroneous analysis as to whether petitioner's purported confession was voluntary;
(b) failure to establish the significance of Mr. Lapointe's disabilities with respect to that analysis and failure to demonstrate the State's role in creating an unreliable record with respect to his disabilities. Also the failure to demonstrate trial counsel's failure to make an adequate record concerning those disabilities and of the prosecutorial misconduct at the trial; CT Page 10870
(c) failure of trial counsel to argue that tape recording of Lapointe' s interrogation, or other protection of his interests was mandatory.
Similar to the claims of ineffective assistance of trial counsel such claims as to appellate counsel require proof of deficient performance and prejudice therefrom. Bunkley v. Commissioner of Correction, supra, 455. The prejudice shown must equate to a reasonable probability that the petitioner remains burdened by an unreliable determination of his guilt.Bunkley, supra 454.
In making this claim, petitioner's habeas counsel ignores the fact that most of the arguments were in fact advanced by appellate counsel. Counsel advised the Supreme Court of petitioner's Dandy-Walker syndrome, and his disabilities therefrom. The Supreme Court, in its opinion, discussed these disabilities at length. Lapointe, 728-735.
Petitioner at the habeas trial, offered no evidence as to his claim that the prosecution falsely asserted to the jury that he was not disabled. The Supreme Court further ruled on the question of tape recording his confessions holding that "electronic recording of confessions is not a prerequisite to their admissibility at trial under Article First § 8 of the State Constitution." Lapointe, 735.
Petitioner's claim that appellate counsel failed to argue as to trial counsel's ineffective assistance is without merit. Such a claim is not reviewable on direct appeal but should be "resolved not in a piecemeal fashion but as a totality after an evidentiary hearing in the trial court where the attorney whose conduct is in question may have an opportunity to testify." State v. Williamson, 206 Conn. 685, 706-707 (1988). See alsoMercer v. Commissioner of Corrections, 230 Conn. 88, (1994).
Accordingly, this court is unable to find that the petitioner has met his burden in this habeas action of ineffective assistance of appellate counsel. Strickland, supra, Bunkley, supra, 455, Mozell v. Commissionerof Correction, 51 Conn. App. 810, 820-824 (1999).
This court therefore finds that the petitioner has failed to prove by the appropriate standards, any of the five counts in his petition and the petition accordingly is dismissed.
Freed, J.